IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MABLE CALEB,                          §
                                      §
        Plaintiff,                    §
                                      §
v.                                    §        CIVIL ACTION NO. H-12-675
                                      §
DR. TERRY GRIER and HOUSTON           §
INDEPENDENT SCHOOL DISTRICT,          §
                                      §
        Defendants.                   §


MEMORANDUM AND ORDER


        Pending are Defendants Houston Independent School District and

Terry Grier's Motion for Summary Judgment and Entry of Final

Judgment on All Claims (Document No. 136), Plaintiff's Motion for

Leave to Amend Complaint to Reassert Dismissed Claims (Document No.

162), and Defendants Houston Independent School District and Terry

Grier's Objections to Plaintiff's Summary Judgment Evidence

(Document No. 165).   After carefully considering the motions,

responses, reply, sur-reply, and applicable law, the Court

concludes as follows.


I. Background


        Plaintiff Mable Caleb ("Plaintiff") was formerly employed by

Defendant Houston Independent School District ("HISD") as the

principal of Key Middle School ("Key") and later, of Kashmere High

School ("Kashmere").   Plaintiff's Corrected Third Amended Original

Complaint--111 pages in length--alleges, in essence, that HISD's Superintendent, Defendant Dr. Terry Grier ("Grier," and together with HISD, "Defendants") targeted Plaintiff for dismissal because of things she said and people with whom she associated, and that he instituted a harassing investigation into her activities at Key and her transition when she was appointed principal at Kashmere.[1]  HISD retained outside counsel, Elizabeth Mata Kroger ("Kroger") and her law firm, to conduct the investigation, which culminated in an extensive March 5, 2010 Investigation Report finding that Plaintiff and other HISD employees had engaged in improprieties including (1) removal of equipment from Key, (2) solicitation of contributions from teachers who wished to teach summer school classes, (3) unauthorized student-targeted fundraising activities, (4) nepotism and payroll discrepancies, and (5) testing improprieties relating to the 2009 administration of the Texas Assessment of Knowledge and Skills ("TAKS") test.[2]

Grier testifies in his Declaration that based on the findings of the Investigation Report, he decided to terminate Caleb.[3]  On or about March 9, 2010, a <u>Houston Chronicle</u> reporter made a request under the Texas Public Information Act for the Investigation

---

[1] Document No. 48-1 (Pls.' Corrected 3d Am. Orig. Compl.).

[2] Document No. 136, ex. C-4.

[3] <u>Id.</u>, ex. A ¶ 11.

Report, pursuant to which Grier released the Report.[4]  On March 22, 2010, Caleb made a written 10-page response to HISD to rebut the findings of the Investigation Report and delivered to HISD a separate letter, also dated March 22, 2010, notifying Defendants of her intent to retire effective August 31, 2010 "due to personal and family medical issues."[5]  Plaintiff released her 10-page response to <u>The Houston Chronicle</u> (the "<u>Chronicle</u>") as an "open letter," and the <u>Chronicle</u> on March 22, 2010 published an article that quoted extensively from the written response denying the allegations of wrongdoing and stated that Plaintiff had given notice to retire.[6]  On April 8, Grier recommended to HISD's Board (the "Board") that it terminate or non-renew the contracts of Caleb and several other Key employees based on the Investigative Report's findings, and the Board terminated Caleb.[7]

In cooperation with Defendants and Kroger, the Texas Education Agency launched a separate investigation into the TAKS testing improprieties, and ultimately sought to revoke Caleb's teaching certificate.[8]  After a hearing, the State Office of Administrative Hearings concluded that "a severe breach of testing security and

---

[4] <u>Id.</u>, ex. A ¶ 12.

[5] Document No. 160, ex. 20 at 3 of 5; <u>id.</u>, ex. 35.

[6] <u>Id.</u>, ex. 10.

[7] Document No. 136, ex. A ¶ 14; <u>id.</u>, ex. A-5.

[8] Document No. 160, ex. 33 at 5 of 63.

confidentiality" had occurred, but that Plaintiff "did not commit any act or fail to take any action as principal of [Key] that resulted in a breach of test security."[9]

Plaintiff, together with four other HISD employees who had been subjects of HISD's investigation, filed this suit against Defendants, Kroger, and two of Kroger's investigators.[10]   After several rounds of amendments and motions to dismiss, the Court on June 13, 2013 dismissed all claims "except only for Plaintiff Caleb's claims that Defendants HISD and Terry Grier retaliated against her for making protected speech to The Houston Chronicle in response to the report published regarding her alleged misconduct, and Plaintiff Caleb's claim that Defendants HISD and Grier deprived her of her liberty interest by denying her a procedural due process hearing to clear her name."[11]   The Court then entered a Final Judgment dismissing all claims of the plaintiffs other than Plaintiff Caleb, and dismissing all of Plaintiff Caleb's claims against all defendants other than Grier and HISD.[12]   The Fifth Circuit affirmed the decision on appeal.[13]

---

[9] Id., ex. 33 at 5 of 63, 59 of 63.

[10] Document No. 1 (Orig. Compl.).

[11] Document No. 98 at 25.

[12] Document No. 114.

[13] Caleb v. Grier, No. 13-20582, 2015 WL 66478 (5th Cir. Jan. 6, 2015) (found at Document No. 145).

4

Defendants now move for summary judgment on Plaintiff's two remaining claims, arguing that (1) Plaintiff's First Amendment retaliation claim fails because her speech to the <u>Chronicle</u> was not a substantial or motivating factor in her termination, (2) Plaintiff's due process claim fails because she did not request a name-clearing hearing, (3) there is no evidence of an HISD Board of Trustees' unconstitutional policy or practice that could subject HISD to liability under § 1983, and (4) Grier is protected by qualified immunity.[14]  Plaintiff responds to Defendants' motion and also moves for leave to amend her complaint and reassert her dismissed claims against Defendants.[15]

## II. Plaintiff's Motion for Leave to Amend

Plaintiff seeks leave to amend her complaint to reassert the following claims which were dismissed in June 2013:  (1) Plaintiff's First Amendment retaliation claim based on her November 12, 2009 speech at a town hall meeting, (2) Plaintiff's First Amendment retaliation claim based on her November 13, 2009 speech in a private meeting with Grier, (3) Plaintiff's First Amendment freedom of association claim based on her political associations, and (4) Plaintiff's Equal Protection claim.[16]  Defendants oppose the

---

[14]  Document No. 136.

[15]  Document Nos. 158, 162.

[16]  Document No. 162.

5

motion, arguing that (1) Plaintiff has previously had multiple opportunities to cure pleading deficiencies and failed to do so, (2) Plaintiff unnecessarily delayed seeking leave to amend, (3) amendment would be futile, and (4) Defendants would be severely prejudiced if amendment is allowed.[17]

Plaintiff's motion is largely a second motion for reconsideration of the Court's Order of June 13, 2013.[18] Plaintiff's previous motion for reconsideration, entitled "Motion for New Trial,"[19] was denied by Order dated September 3, 2013.[20] In the previous motion, as here, Plaintiff complains about dismissal of her November 12, 2009 and November 13, 2009 public speech claims, and of her freedom of association claim. Serial motions for reconsideration are not favored, and here there is only a rehash of what previously was considered. *See* LeClerc v. Webb, 419 F.3d 405, 412 n.13 (5th Cir. 2005) ("A motion for reconsideration may not be used to rehash rejected arguments or introduce new arguments.").

Plaintiff already has been allowed multiple amendments, and failed to correct the deficiencies despite two earlier rounds of

---

[17] Document No. 166.

[18] Document No. 98.

[19] Document No. 101.

[20] Document No. 108.

motions to dismiss.[21]  *See, e.g.*, <u>Herrmann Holdings Ltd. v. Lucent</u>
<u>Techs. Inc.</u>, 302 F.3d 552, 566 (5th Cir. 2002) (affirming denial of
leave to replead where plaintiff already had twice been given leave
to amend).  For all of these reasons, as well as the inexplicable
filing of the motion more than 20 months after the claims were
dismissed and the unfair prejudice that Defendants would suffer if
long-since dismissed claims were now resurrected, Plaintiff's
Motion for Leave to Amend is denied.

### III. <u>Defendants' Evidentiary Objections</u>

Defendants object to several exhibits attached by Plaintiff to
her Response to Defendants' Motion for Summary Judgment.[22]

Defendants' objection to the "Rhetorical Analysis" of
Dr. Kevin Cummings (Plaintiff's Exhibit 12) is SUSTAINED because
Dr. Cummings was not timely disclosed as an expert; moreover, the
Court previously denied as untimely Plaintiff's attempt to name
Dr. Cummings as an expert witness.[23]  *See* FED. R. CIV. P. 37(c)(1)

---

[21]  *See* Document No. 98 at 1 n.1 (June 13, 2013 Memorandum and
Order dismissing most of Plaintiff's claims) ("In light of
Plaintiffs' prior filings of complaints--the *Third Amended*
Complaint is now under review--and with no consequential
transactions, occurrences, or events having occurred after
Plaintiffs filed their current pleading of more than 100 pages in
length, the Motion to file Supplement (Document No. 92) is
DENIED.") (emphasis in original).

[22]  Document No. 165.

[23]  Document No. 98 at 1-2 n.1 ("Plaintiffs' Motion for Leave
to File Designation of Expert Witness (Document No. 83), which is

("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").

Defendants' hearsay objection to newspaper articles that are Plaintiff's Exhibits 11, 22, 29, 30, and 31 is SUSTAINED, and the articles are excluded as evidence of the truth of the matters asserted therein; but the objection is OVERRULED as to Plaintiff's limited offers for the purposes of showing newspaper coverage of HISD events and exhibiting articles about which Grier was questioned in his deposition.

Defendants' relevance objection to the affidavit of Carol Mims Galloway (Plaintiff's Exhibit 15), which Plaintiff admits "does not relate to facts of this case,"[24] is SUSTAINED.

Defendants' relevance and foundation objections are SUSTAINED as to Plaintiff's Exhibit 23, which includes an affidavit of Glen White and part of an affidavit of Tony Shelvin, both unrelated to Plaintiff, and unauthenticated documents relating principally to the investigation of Herbert Lenton.

---

opposed by Defendants HISD, Grier, and Kroger, is DENIED as having not been timely filed before the deadline for identifying expert witnesses expired.").

[24] Document No. 171 at 2.

8

Defendants' relevance objection to the affidavit of Sabrina Norman and news article at Plaintiff's Exhibit 25 is OVERRULED. Defendants' hearsay objection to the news article is SUSTAINED.

Defendants' relevance and foundation objections to the declaration of Rep. Harold Dutton (Plaintiff's Exhibit 2) are OVERRULED.

Those portions of the evidence to which objections are sustained are STRICKEN, and all remaining objections are OVERRULED.

## IV. <u>Motion for Summary Judgment</u>

A.   <u>Legal Standard</u>

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. <u>Morris v. Covan World Wide Moving, Inc.</u>, 144 F.3d 377, 380 (5th Cir. 1998).  A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice. <u>Id.</u>  "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." <u>Id.</u>  "A party asserting that a fact cannot be or is

9

genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Id. 56(c)(3).

In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2513 (1986). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. Kelley v. Price-Macemon, Inc., 992 F.2d 1408, 1413 (5th Cir. 1993). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." Id. Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." Anderson, 106 S. Ct. at 2513.

B.   Analysis

    1.   First Amendment Retaliation

    Plaintiff's First Amendment retaliation claim is that "Defendants HISD and Terry Grier retaliated against her for making protected speech [through her 'open letter'] to The Houston Chronicle in response to the report published regarding her alleged misconduct."[25]   This claim relates to a March 22, 2010 article written by Ericka Mellon in the Chronicle, reporting Plaintiff's announcement on that same date that she intended to retire.[26]   The article reported:

> HISD Superintendent Terry Grier said he had not seen Caleb's letter giving notice.  But he said he would discuss with the school district's attorneys whether to accept her retirement or to fire her sooner.  The school board would have to approve the termination, and it could end up in an expensive legal battle.[27]

After summarizing portions of Plaintiff's written response to the investigation, in which she maintained her innocence of any wrongdoing and characterized the investigation as a "personal attack" by Grier, the article concluded by quoting Grier: "'It's sad that she wants to blame me for this type of conduct at Key and

---

[25] Document No. 98 at 25.

[26] Document No. 159, ex. 10.

[27] Id., ex. 10 at 1.

11

at Kashmere,' Grier said.    'Nothing could be further from the truth.'"[28]

To establish a § 1983 claim for retaliation against protected speech, Plaintiff must show: (1) she suffered an adverse employment action; (2) she spoke as a citizen on a matter of public concern; (3) Plaintiff's interest in the speech outweighs the public employer's interest in efficiency; and (4) the speech precipitated the adverse employment action.[29] Nixon v. City of Houston, 511 F.3d 494, 497 (5th Cir. 2007).  Once a plaintiff has shown that his protected speech "was a substantial or motivating factor in the defendant's adverse employment decision, a defendant may still avoid liability by showing, by a preponderance of the evidence, that it would have taken the same adverse employment action even in the absence of the protected speech."  Haverda v. Hays Cnty., 723 F.3d 586, 591-92 (5th Cir. 2013) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 97 S. Ct. 568, 576 (1977)).  "An employee can, however, refute that showing by presenting evidence that 'his employer's ostensible explanation for the discharge is

---

[28] Id., ex. 10 at 3.

[29] As noted in Court's June 13, 2013 Memorandum and Order, "[a]lthough [Plaintiff's] complaint does not cite 42 U.S.C. § 1983, Section 1983 is the statute that provides a private cause of action for redressing a violation of federal law or 'vindicating federal rights elsewhere conferred.'"   Document No. 98 at 5 (citing Albright v. Oliver, 114 S. Ct. 807, 811 (1994)).

merely pretextual.'" <u>Id.</u> at 592 (citing <u>Coughlin v. Lee</u>, 946 F.2d 1152, 1157 (5th Cir. 1991)).

Defendants do not dispute that Plaintiff suffered an adverse employment action when she was terminated by HISD on April 8, 2010, and the Court assumes--as Plaintiff insists--that Plaintiff spoke as a citizen on a matter of public concern, and that her interest in the speech outweighs HISD's interest in efficiency.[30] Defendants argue, however, that there is no evidence that Plaintiff's speech to the <u>Chronicle</u> was a motivating factor in Grier's decision to recommend her termination; to the contrary, Grier wanted Plaintiff fired because he believed that her discharge was warranted by the findings of the Investigation Report.[31] Plaintiff responds that the

---

[30] Defendants also "assum[e] *arguendo*" that Plaintiff's speech to the <u>Chronicle</u> was protected, but reurge in a footnote their argument--which the Court rejected when ruling on their motion to dismiss--that Caleb's speech is not protected because it concerned her individual employment and answered claims about her misconduct. Document No. 136 at 13, n.6. Although "[s]peech that is primarily motivated by, or primarily addresses, the employee's own employment status *rather than a matter of public concern* does not give rise to a cause of action under § 1983," <u>Foley v. Univ. of Houston Sys.</u>, 355 F.3d 333, 341 (5th Cir. 2003) (emphasis added), Plaintiff's employment and the allegations against her had received extensive media coverage in this case after Defendants released video footage and the Investigation Report to the press. Thus, viewing the evidence on summary judgment in the light most favorable to the non-movant, Plaintiff's evident release to the <u>Chronicle</u> of her written response to HISD may therefore arguably be characterized as addressing a matter of public concern. *See* <u>Connick v. Myers</u>, 103 S. Ct. 1684, 1690 (1983) ("Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record.").

[31] Document No. 136 at 14-21.

close timing between her speech to the <u>Chronicle</u> and her termination is sufficient to make out a *prima facie* case of retaliation, and that Grier's purported reliance on the Investigation Report is pretextual because the report "found the opposite of what Grier says he believed and for which he decided to terminate Caleb."[32]

Defendants first argue that "there is nothing in the record or Plaintiff's petition to indicate that Grier had seen the article at the time he decided to terminate Caleb, or before the Board vote on her termination."[33]  Grier testified in his deposition that he did not recall, but did not deny, his reported conversation with Mellon that resulted in her use of quotes attributed to him in the <u>Chronicle</u> article.[34]  However, Grier's quotes themselves raise an inference that he was aware--if only because of his conversation with Mellon--of at least some of Plaintiff's speech to the <u>Chronicle</u>; namely, that Plaintiff had submitted a notice of her intent to retire and that she "want[ed] to blame [Grier] for this type of conduct at Key and Kashmere."[35]  This evidence when construed in the light most favorable to Plaintiff is sufficient to

---

[32] Document No. 158 at 28.

[33] Document No. 136 at 15.

[34] Document No. 159, ex. 3 at Vol. 2, 78:1-79:7.

[35] <u>Id.</u>, ex. 10 at 3 of 6.

14

raise at least a fact issue that Grier had notice of Plaintiff's speech to the Chronicle before he recommended her termination.

Plaintiff produces no direct evidence that Defendants terminated her because of her speech to the Chronicle, and relies only on the close timing between her speech and termination. In evaluating a First Amendment retaliation claim, "[c]lose timing between an employee's protected activity and an adverse employment action can be a sufficient basis for a court to find a causal connection required to make out a prima facie case of retaliation." Mooney v. Lafayette Cnty. Sch. Dist., 538 F. App'x 447, 454 (5th Cir. 2013) (citing Evans v. City of Houston, 246 F.3d 344, 354 (5th Cir. 2001) (reversing summary judgment dismissal of Title VII retaliation claim)). "[T]emporal proximity between protected activity and an adverse employment action should be viewed in the context of other evidence. The causal connection prong, for example, may also be satisfied when the plaintiff relies upon a chronology of events from which retaliation may plausibly be inferred." Id. (citing Brady v. Houston Indep. Sch. Dist., 113 F.3d 1419, 1424 (5th Cir. 1997)) (footnote omitted).

The relevant chronology of events, according to Plaintiff, began in mid-November 2009, when "Grier, the relatively new Superintendent of HISD, was publically [sic] embarrassed by the community church rally where he was labeled a 'liar,' picketed, and

chided by Caleb."[36]  Plaintiff argues that shortly thereafter, Grier
retained investigators "for the specific purpose of investigating
of Caleb and Key Middle School," and that "Grier targeted Mable
Caleb" in that investigation.[37]  The uncontroverted summary judgment
evidence is that the HISD investigation began after HISD received
an anonymous complaint in November, 2009, concerning "funny
business" at Key, stating that "many things are missing from the
school," and encouraging examination of surveillance tapes on
October 31, 2009, a Saturday.  When the tapes were examined persons
were seen carrying various boxes and materials out of the audio
visual rooms at Key, and Plaintiff is seen observing some of the
activity.[38]   Two men--the plant operator at Kashmere and the
Kashmere custodian--were seen exiting with various boxes and
equipment that were placed in a truck driven away from Key.  Items
removed included a desk, a leather chair, computer equipment in
original boxes, metal cabinets in their original boxes, and also
some personal items belonging to Plaintiff.

The Investigation Report was issued on March 5, 2010, the
Chronicle article was published on March 22, 2010, and Plaintiff

---

[36] Document No. 158 at 25-26.  As noted above, Plaintiff
attempts to reurge her dismissed retaliation claims based on these
earlier events.

[37] Id. at 26.

[38] Document No. 136, ex. C-2.

16

was terminated at the April 8, 2010 Board meeting.[39]   Although
Plaintiff was terminated fewer than three weeks after what
Plaintiff refers to as her "open letter" to the <u>Chronicle</u>,
Plaintiff's allegations and testimony--like her argument in
opposition to summary judgment--have consistently claimed that
Grier targeted Plaintiff for investigation and termination when
Plaintiff and Grier had confrontations in the Fall of 2009, months
*before* Plaintiff's letter to the <u>Chronicle</u>.[40]   Indeed, Plaintiff
alleges that "Grier's personal hostility towards Caleb peaked on or
about November 12-13, 2009," five months before she was
discharged.[41]   Plaintiff's chronological narrative is thus at odds

---

[39] *See* <u>id.</u> ex. A-4 (notice of termination).

[40] *See* Document No. 159, ex. 1 at 70:24-71:24 ("Q. I'm really
just trying to establish, do you have a belief as to why they
started that investigation? A. **[Plaintiff Ms. Caleb]** Yes. Q. And
what was that?  What is your belief?  Why did HISD begin that
investigation?  A. The--I know that the investigation started, it
was because I got Dr. Grier really upset after those community
meetings and after the meeting with him and with him being so rude
and unprofessional and making his statements, and I decided to
stand up and speak up for myself.  And I believe that Dr. Grier,
with the shouting and all he was doing in his office, never thought
that I would just take a stand.  So I took a stand, told him how I
felt.  And when he asked me about didn't I know that they were
going to picket me, and I had an obligation to tell him, just one
thing led to another and remarks that he made to me and with my
response to him--or responses to him during that con--during that
Friday evening meeting.  So I felt that it was retaliation or I did
not bow down to his intimidation.  Q. And do you believe that the
termination of your employment was for the same reasons?  A. Yes,
I believe it was for the same reason.").

[41] *See* Document No. 48-1 at 13.

with her retaliation theory, namely, that it was Plaintiff's speech to the <u>Chronicle</u> that caused Grier to seek her termination.

Regardless, assuming the temporal proximity between Plaintiff's speech to the <u>Chronicle</u> and her termination were sufficient to make out a *prima facie* case of retaliation, Plaintiff has presented no evidence to show that Defendants' proffered legitimate reason for her termination was pretextual. *See* <u>Haverda</u>, 723 F.3d at 591-92. Plaintiff was terminated after Defendants received an extensive investigation report which concluded that Plaintiff had engaged in numerous instances of misconduct including mismanagement of fixed assets resulting in tens of thousands of dollars in missing computer equipment, inappropriate student-targeted fundraising activities, misuse of Title I funds, misuse of HISD's resources and personnel, nepotism, and poor oversight of TAKS testing which resulted in cheating.[42] Grier's uncontroverted declaration testimony is that

> I considered the report's findings of financial mismanagement and misconduct to be very serious. Taken as a whole, the findings indicated to me that Ms. Caleb was not following district policies, was not properly managing the District's assets, and was not properly supervising campus staff. Therefore, based on these findings, I made the determination that the District should initiate termination or nonrenewal proceedings against Ms. Caleb and several other Key staff.

* * *

---

[42] *See* Document No. 136, ex. C-4.

18

After making the determination to terminate or non-renew Ms. Caleb and other employees, I became aware that Ms. Caleb submitted a request to retire at the end of her contract.   I chose to instead move forward with her termination because I believed at the time, and still do believe, that these findings evidence gross mismanagement and misconduct by Ms. Caleb.   I would do the same with any employee who I believed engaged in such serious misconduct.   In fact, I did do the same with Ms. Delores Westmoreland, who was the Dean of Instruction at Key Middle School during the time period at issue in the report.[43]

HISD's General Counsel Elneita Hutchins-Taylor testifies in her Declaration, "I was present when Ms. Mata-Kroger met with Dr. Grier and went over the findings of the investigation.   He expressed to me his belief that the report demonstrated that Ms. Caleb, among others, needed to be terminated."[44]

The further uncontroverted evidence is that Grier followed the same practice for each investigated employee implicated in gross mismanagement and/or misconduct and whom Grier recommended be terminated.   For example, the summary judgment evidence is that Ms. Westmoreland, Dean of Instruction at Key, was also implicated by the Investigation Report and, like Plaintiff, filed with HISD a response denying the findings and notifying HISD of her intent to

---

[43] Id., ex. A ¶¶ 11, 13.   *See also* Document No. 159, ex. 3 at Vol. 2, 64:12-20 ("Q. Now, do you recall what prompted you to make that--to make the decision to terminate her on April the 14th, 2010?  A. Basically, the result of the investigation that had been conducted.  Q. The report?  A. Uh-huh.  Q. The Mata Kroger report?  A. Yes.").

[44] Document No. 136, ex. C ¶ 7.

retire.  Unlike Plaintiff, however, Ms. Westmoreland did *not* speak to or release her response to the Chronicle.  Nonetheless, Grier recommended that she be terminated based on the Investigative Report's findings of misconduct, just as he recommended for Plaintiff.  On this summary judgment record, Defendants have met their burden to produce uncontroverted evidence that HISD had a legitimate reason for terminating Plaintiff and would have done so in the absence of her speech to the Chronicle.

Plaintiff responds that Grier's purported reliance on the Investigation Report is pretextual because "[i]f Grier believed the findings of the Report, however, he would have to believe that all the alleged assets, property, and computers, were accounted for-- *that is what the Report found*."[45]  Plaintiff's characterization of the Report is a demonstrable misstatement.  The paragraph of the Report cited by Plaintiff, read in context of the Report, states that after an unannounced physical inventory had been conducted at Key in December 2009, in which there were found missing 21 of 55 CPUs acquired by Key in June, 2009 under P.O. No. 4501361495, a subsequent physical inventory was taken on January 13, 2010, in which "all twenty-one (21) previously unaccounted for CPUs were located at Key."[46]  This finding cited by Plaintiff for her argument that "all the alleged assets . . . were accounted for" is a

_____

[45] Document No. 158 at 28 (emphasis in original).

[46] Document No. 136, ex. C-4 at 15.

reference to equipment acquired by only *one* of *eight* recent purchase orders that were listed in the Report.  The Investigation Report's "Summary of Missing Fixed Assets"--ignored by Plaintiff-- reports the findings of HISD's Property Management Department after it was asked to locate at Key fixed assets on *eight* purchase orders, which assets were received during the final seven months that Plaintiff was principal at Key, from December 2008 through June 2009. (Ms. Caleb was appointed principal of Kashmere on June 29, 2009.)  After identifying the eight purchase orders by number (only one of which was P.O. 4501361495, the one referred to in Plaintiff's argument), the Report summarizes:

> The physical inventory related to these eight (8) PO's revealed missing equipment with a total original cost of $36,645.00.[47]

Plaintiff's argument that the Report found that "all of the alleged [missing] assets, property, and computers, were accounted for" has no factual basis in the summary judgment record.[48]

---

[47] Id., ex. C-4 at 20.

[48] The details of the missing and later-found CPUs on this one Key purchase order referred to by Plaintiff are perplexing, to say the least.  An unannounced physical inventory was conducted at Kashmere on December 4, 2009, which turned up some but not all of the missing items on this Key purchase order.  After that December 4 physical inventory at Kashmere, the missing Key Item No. 5 (a CPU) "was later found in its original box in Ms. Caleb's office at Kashmere," and missing Key Item Nos. 8 and 9 (HP monitors) "were later found the following week on December 10, 2009, in their original boxes in Ms. Caleb's office at Kashmere." All of the 21 "previously unaccounted for CPUs [found] located at

It is uncontroverted that the Investigative Report presented to Superintendent Grier, consisting of approximately 87 pages, was the product of a three months' investigation by outside counsel, who interviewed more than 50 witnesses and other individuals during the course of the investigation. It was this report that Grier states he relied upon when he determined that Caleb should be fired. Excerpts from the Executive Summary, at pages 2-4 of the Investigative Report, evidence the kinds of findings made with respect to Plaintiff and those whom she was charged to manage:

> Mable Caleb, Key's former principal, and others at Key often stated during their interviews that their first priority was "the children" of Key and their protection and education. Unfortunately, the acts and omissions of several at Key belie these stated sentiments. Key students were seemingly not the priority when fixed assets and other resources purchased for their education were not properly safeguarded or managed. Thousands of dollars of Key equipment is either missing or unaccounted for and was never reported missing, lost or stolen. The inventory signed and submitted by Ms. Caleb in March 2009 denotes over $200,000 of equipment as "Lost During Move," referring to Key's move during the mold remediation at the school in the 2007-2008 school year. The move, however, had occurred 12 months prior to Key's submission of the inventory to the District and missing equipment was denoted as "Lost During Move" even though [the equipment] was received *after* the move. In addition, tens of thousands of dollars of recently purchased equipment for Key students is also missing; this amount does not include the value of the fixed assets purportedly borrowed for use at Kashmere.

> \* \* \*

---

Key" on January 13, 2010 were items acquired on this one purchase order in June 2009.

District policies were regularly ignored at Key and there were seemingly no effective checks and balances so that violations of policy could be promptly detected, reported and addressed: a grossly inadequate inventory of Key's fixed assets was not detected when it was submitted, and thousands of dollars of District funds and grant money were used to purchase banned food items which were not only available to students in violation of State and District guidelines but actually sold to these students for profit. How much money was raised from student-targeted fundraising at Key and what happened to it remains a mystery.

Other forms of mismanagement and misconduct were also found. Nepotism resulted in Ms. Caleb's niece, Elgie Wade, earning an additional 75% of her base pay, in the 2008-2009 school year, through overtime, extended pay and summer school work. No one else in the school received such favorable treatment. Moreover, the evidence reflects that at Ms. Caleb's direction, overtime was paid to Ms. Wade regardless of hours reflected on the District's sign-in sheets. In addition, Ms. Caleb's son was allowed to work in a federally-funded summer school program and during summer school at Key while Ms. Caleb was still the principal, in violation of the District's rules prohibiting nepotism.

* * *

The evidence reflects that there was a pattern and practice of gross mismanagement and abuse of authority by Key administration including Mable Caleb, Bernett Harris, and Peggy Collins. Other Key employees participated by distributing live TAKS tests and misrepresenting their credentials during this investigation (Richard Adebayo), attempting to obstruct the investigation (Herbert Lenton), participating in a fraud on the school district by accepting compensation for hours not documented as worked and misuse of the PROCARD (Elgie Wade), failing to oversee the proper administration of the TAKS testing as well as misuse of the PROCARD (Dolores Westmoreland), and failing to properly oversee special education services at Key (Jackie Anderson).

There was no credible evidence found that the unauthorized activities and policy violations taking place at Key were done with students' interests in mind (as suggested by some witnesses). Rather, the evidence

23

suggests that the students and the many hard working
teachers who labor on their behalf were not the priority
for Key's administration.[49]

Plaintiff has failed to present any evidence sufficient to raise a

fact issue that Superintendent Grier's declared reliance upon this

Investigative Report for concluding that Caleb should be discharged

was pretextual and that the real reason was because Caleb had in

her "open letter" to the Houston Chronicle stated that the

allegations were false, that she was wrongfully targeted, and that

she was announcing her intention to retire.[50]   Because there is no

fact issue on pretext, and because Defendants have met their burden

to establish a legitimate reason for terminating Plaintiff and that

they would have done so in the absence of her speech to The Houston

---

[49] Document No. 136, ex. C-4 at 2-4.

[50] Plaintiff relies on Guerra v. Roma Indep. Sch. Dist., 444
F. Supp. 812 (S.D. Tex. 1977), in which the court found after a
bench trial that the school district's proffered explanation for
termination and demotion was pretextual where "the only credible
explanation for the nonrenewal and/or demotion of these four
teachers was their relationship with Arnulfo Guerra, a political
opponent of three recently elected board members and of their Old
Party leader."   Id. at 819.   However, in Guerra, "[a]ll four
teachers in question were praised by their supervisors; both their
principal and their superintendent recommended that their
three-year contracts be renewed," and "[n]o dissent from these
evaluations or recommendations came in evidence.   Yet without any
contrary recommendation, without any discussion or any vote, those
recommendations were not followed."   Id. at 820.   Here, in
contrast, the Investigation Report provides a compelling basis for
Plaintiff's termination, and the uncontroverted evidence is that
Defendants terminated her because of the report's findings.

Chronicle, Defendants are entitled to summary judgment on Plaintiff's First Amendment retaliation claim.

   2.   Liberty Interest Due Process Violation

   Plaintiff's remaining claim is that Defendants deprived her of her liberty interest by denying her a procedural due process hearing to clear her name.[51] To prevail on such a claim, Plaintiff must show:  (1) that she was discharged; (2) that stigmatizing charges were made against her in connection with the discharge; (3) that the charges were false; (4) that she was not provided notice or an opportunity to be heard prior to her discharge; (5) that the charges were made public; (6) that she requested a hearing to clear her name; and (7) that the employer refused her request for a hearing.  Hughes v. City of Garland, 204 F.3d 223, 226 (5th Cir. 2000).  Plaintiff admits that she never requested a name-clearing hearing.[52]  Accordingly, Defendants are entitled to summary judgment on Plaintiff's liberty interest due process claim. See Bledsoe v. City of Horn Lake, Miss., 449 F.3d 650, 653 (5th

_____

   [51] Document No. 98 at 25-26.

   [52] Document No. 159, ex. 1 at Vol. 102:13-17 ("Q. Let me ask it again because I'm not sure.  Did you make a request for a name-clearing hearing to HISD?  [Objection.]  A. No.").  See also Document No. 136, ex. C ¶ 12 ("At no time did Ms. Caleb request a name clearing hearing to defend the conclusions contained in Ms. Kroger's report.").

Cir. 2006) ("Bledsoe's undisputed failure to request a hearing defeats his liberty interest claim.").[53]

## V. Order

For the foregoing reasons, it is

ORDERED that Defendants Houston Independent School District and Terry Grier's Motion for Summary Judgment and Entry of Final Judgment on All Claims (Document No. 136) is GRANTED, and Plaintiff Mable Caleb's claims are DISMISSED with prejudice.  It is further

ORDERED that Plaintiff's Motion for Leave to Amend Complaint to Reassert Dismissed Claims (Document No. 162) is DENIED.

The Clerk shall notify all parties and provide them with a true copy of this Order.

SIGNED at Houston, Texas, on this 29th day of April, 2015.

_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE

---

[53] *See also* Caleb v. Grier, 2015 WL 66478, at *10 (Fifth Circuit's opinion affirming dismissal of co-plaintiffs' claims in this case) ("Cockerham's, Banks's, and Lenton's failure to allege that they asked for and were refused a hearing is dispositive.").